CITY OF ST. PETERSBURG, a Municipal Corporation, Employer, and GLOBE INDEMNITY COMPANY, a Corporation, Carrier, v. MRS. WILLIAM MOSEDALE, Claimant and Widow.

1 So. (2nd) 878
Division B
Opinion Filed April 29, 1941

*McKay, Macfarlane, Jackson & Ferguson,* for Appellants; *B. M. Skelton,* for Appellee.

PER CURIAM.—The record in this case discloses that William Mosedale had been for approximately twelve years prior to November 18, 1937, employed as chief engineer at the municipal gas plant by the City of St. Petersburg at the sum of $187.50 per month and was injured in an explosion at said plant on November 18, 1937, and died on February 8, 1939, at the age of sixty-nine years. He is survived by his widow, the claimant, and one married daughter. The deceased received compensation in the sum of $177.00 between the dates of November 30, 1937, and February 6, 1938.

Mrs. William Mosedale filed a petition before the Florida Industrial Commission against the City of St. Petersburg

and the insurance carrier, Globe Indemnity Company, under the provisions of Chapter 17481, Acts of 1935, Laws of Florida. The petition alleged that William Mosedale, on or about November 18, 1937, received or sustained injuries in the course of his employment from which he died. The parties adduced considerable testimony before C. E. Beck, deputy commissioner, and after hearing all the testimony, the deputy commissioner concluded that the death of William Mosedale was not caused by the explosion at the municipal gas plant on November 18, 1937, and accordingly dismissed the said petition or complaint.

The order as made by C. E. Beck, deputy commissioner, *supra,* was appealed from and reviewed on the record by the members of the Industrial Commission, who filed their order on February 12, 1940, reversing the order of dismissal of the complaint as made by the deputy commissioner and thereby held that the death of William Mosedale was caused by the explosion at the municipal gas plant on November 18, 1937, and ordered or directed the insurance carrier to pay to the complainant the sum of $18.00 per week for a period of not to exceed 350 weeks, together with medical and funeral expenses, as provided for by said Act.

On appeal from the aforesaid order of the Florida Industrial Commission to the Circuit Court of the Sixth Judicial Circuit, the said testimony, with letters and exhibits, certified to as being a true and correct transcript of the record as previously considered by the Florida Industrial Commission, the Honorable T. Frank Hobson, after hearing, on September 21, 1940, made and entered an order affirming the order as entered by the Florida Industrial Commission under date of February 12, 1940. From said order of affirmance an appeal has been perfected to this Court in conformity with the mandates of said Act, and six assignments of error for a reversal of the order dated

February 12, 1940, entered by the Honorable T. Frank Hobson, circuit court, are suggested. The assignments are based on the sufficiency of the testimony or an erroneous consideration thereof or applied the wrong principle of law to the testimony or evidence.

The question for a decision as presented by this record is whether or not William Mosedale received or sustained injuries in the course of his employment that subsequently caused his death. Counsel for the respective parties, by stipulation appearing in the record, put at rest many of the pertinent questions in issue. Dr. Wade testified that William Mosedale had been one of his patients since 1921 and called at his office for physical examinations and he was examined on July 30, 1937, and at that time was in average good physical condition; that he saw him in December, 1937, and in January, 1938, and found a change in his condition; he had heart trouble, bronchitis, tenderness around the upper part of his abdomen; and he treated Mosedale during the year 1938. The record shows:

"Q. Doctor, in your opinion as a physician, was there any connection between the cause of the death and the accident which occurred in the gas plant on the 18th day of November, 1937?

"A. Well, as a matter of opinion I think there was.

"Q. Will you explain how you arrive at that opinion in more detail?

"A. Well, I know that the man had been in what I considered average physical health at the time of the accident. He had been able to do his work, had not missed any time of any consequence until this accident. I know that he definitely had a chronic condition arising from this accident that never got any better. He had chronic bronchitis developed from inhalation of gas. I know definitely that his heart was damaged, which showed at autopsy that he still

had some damage of the heart, at times that damage might have been more marked immediately after the operation than at the time of the death. I also note from the patient's own statement time and time again that he had never been a well man at any time after the accident even though working. Was working because felt like he had to, and he wasn't entirely able to go on with his work at any time after the accident, in my opinion. Now the beginning of this liver condition that caused his death, in my opinion, came on after the accident. Of course, that is just a matter opinion, nobody knows when this abscess, or what was stated in the findings was a primary carcinoma of the liver, when it got its origin, makes no difference what it was anyway. But I think on the weakened backgrounds, that is with lowered resistance that it would have been more likely, something like this would have been more likely to develop than it would in a well man. And we also know by primary carcinoma is a very rare condition and that we also know definitely that he did not have any other carcinoma in the body, and any other cancer in the body, and then these rare conditions where they do get a primary carcinoma it usually comes on background of previous liver pathology, that is inflammatory change in the liver which is called hepatitis, or inflammation of the liver. We believe that this condition of the liver was produced by the accident and that it followed in natural sequence the malignant growth was superimposed on this inflammatory process of the liver, or that it came as a later complication of it. I would also like to make a statement that Mr. Mosedale was a man of high integrity and I would take his word for anything that he said, and when he told me that he was never a well man after the accident that carried a lot of weight in my opinion, along with the physical findings."

Dr. Strickland testified that on the morning of November

18, 1937, William Mosedale was brought to his office for treatment directly from the gas plant where he was injured; that he found him to be suffering with first-degree burns around the neck, shoulders and breast. He went to the physician's office for a few days after the accident and was then placed in bed, but gradually grew worse, but his burns improved or healed. He had shortness of breath, a coronary failure, fluid in his chest, nausea and vomiting, and digestive disturbances. The record shows: (Dr. Strickland) :

"A . . . Now this went on over a period from the day of the accident until January 18, and ten days prior to this, which would be about the 10th of January, he felt that he had improved enough to do light work. In the meantime I had notified Mr. Brushwood of this finding and he was keeping in very close touch with the case through me, very coöperative, very coöperative. On January 18 he said send in my last report, that is 1938. He insisted that he was able to do light work, I insisted he wasn't able to do light work, to do anything for a livelihood, but his loyalty to his job and to his employees over-persuaded me and I let him go to work. I never saw him any more until I was called on consultation during his last illness, the date I don't recall offhand. He never has been well since the date of the accident. Never was well to my knowledge.

"Q. Ask you if he ever fully recovered from that accident?

"A. Never fully recovered. I am on record as to that somewhere, as never having recovered after the accident. . . .

"Q. Doctor, don't let me influence your opinion, but something I will have to ask by a leading question. Do I understand that it was your opinion that the trouble with the liver was abscess and not carcinoma, but you are bowing to some other person's opinion there was some carcinoma or cancerous condition there?

"A. What I think when the thing was opened was just abscess of the liver. The word carcinoma never entered my mind.

"Q. The carcinoma idea did not arise until the pathologist's report came back?

"A. Just like an abscess or boil, stick knife in it and pus. That was what found at autopsy, no thought of carcinoma because didn't find anywhere else in the body. . . .

"Q. Would you say any connection between this bronchial condition, cough as evidenced by cough that you found, and the abscess of the liver?

"A. I think that the respiratory condition, the stomach condition, heart condition and your abscess is all a direct tracing to the accident.

"Q. As I understand your answer to that question, Doctor, you feel that the heart condition and bronchial condition were the result of the accident?

"A. Indirectly, yes sir.

"Q. And that this weakened this man's condition?

"A. Yes, sir, lowered his resistance.

"Q. Lowered his resistance so that when this abscess of the liver developed it was fatal?

"A I think he died of abscess of the liver, say yes too that it was fatal, whatever he had as a result of his injury. . . .

"Q. You have had an opportunity to examine the report made by Dr. Wylie and Dr. Mills?

"A. Yes, sir.

"Q. Do you accept their findings to be correct?

"A. No, sir.

"Q. In what respect do you differ from them?

"A. The man died—Dr. Mills' statement is, and he may have found, I don't doubt he may have found a carcinoma cell, but the man didn't have enough cancer to kill him.

"Q. What killed him?

"A.   Abscess of the liver.

"Q.   You think then he died of abscess of the liver and not carcinoma of the liver?

"A.   Yes."

Dr. Wylie was called for consultation and diagnosed the ailment as abscess of the liver and advised an operation, which he performed.   After death an autopsy was performed and portions of the liver removed and examined and found to be malignant.   Dr. Wylie, in part, testified:

"A.   . . . His heart was apparently normal size.   On cross section showed normal muscles of the ventrical. Both valves showed evidence of marked thickening and both coronary vessels were scerlosed, or calcified as we call them.   Now the abdomen was occupied in the upper half of the abdomen by an enormously large liver held to the abdominal wall in front all the way across by adhesions. The opening that I had made before was gaping and contained necrotic tissue.   I removed that liver and cut it up into a series of layers and it was studied throughout by a dozen or more circumscribed areas of what looked like necrotic tissue.   We debated then whether it was carcinoma. We are supposed to know when look at carcinoma by our eyes whether it is carcinoma or not, but in this particular specimen we were unable to tell definitely because of the marked destruction of the liver tissue.   Further inquiry found, the kidneys were small, showed evidence of chronic inflammatory process.   The gall bladder was perfectly normal in size, and believe the ducts were normal.   The intestines were normal as well as the bladder.   My statement that the cause of death was due to the abscess of the liver, or multiple abscesses of the liver, and associated with the broncho-pneumonia, or pleurisy and bronchiectasis. . . .

"Q.   Doctor, you have heard the testimony with reference to the history of an accident involving Mr. Mosedale.   I

want to ask you whether or not, in your opinion as a physician and a surgeon, there is any connection between the injuries received as testified in your presence this morning and the results you found upon this examination?

"A. I have felt, and all the way through, at the time when I first met Mr. Mosedale, and since then, the evidence I gathered as a surgeon that the death of Mr. Mosedale was indirectly caused by this accident. I never considered that the inhaling of carbon monoxide gas had anything to do with the thing. The injury and shock and lowering of his vitality was the cause of his undoing. If he hadn't been subjected to that would probably have been alive today."

S. E. Boughton described the explosion at the gas plant and the escape of Mosedale. Charles A. Teaff, who resided next door to Mosedale and saw him daily after the explosion as well as prior thereto, testified Mosedale never recovered from his injuries. C. W. Hicks, H. R. Barger, and J. W. Boswell gave similar testimony.

The appellees offered Dr. Mills, a pathologist, who testified about a post-mortem examination of the deceased and who examined miscroscopically the vital organs of the deceased. It was the opinion of the witness that the injuries sustained in the explosion at the gas plant were not contributing factors to the cause of death. The witness testified in part:

"Q. Dr. Mills, based upon your examination and microscopic study, what was your opinion as to the cause of Mr. Mosedale's death?

"A. In citing the cause of death in any cause we are sometimes somewhat puzzled because it is in the experience of all pathologists' patients have many diseased processes combined. In this case, because of its importance and because it is of sufficient severity to cause death, and since I considered the other diseased conditions more or less

secondary or merely associated conditions, I cited primary carcinoma of the liver as the cause of death in this case.

"Q. Did you, in your examination, find a diseased condition in Mr. Mosedale?

"A. Yes sir, several diseased conditions.

"Q. In your opinion was his death the result of these diseased conditions you found?

"A. Yes, sir. Primary cancer of the liver, or I should say principally, cancer of the liver.

"Q. In your opinion did the diseased conditions other than the primary cancer of the liver which you found cause his death?

"A. It is very difficult to say what the predominating factor is in the cause of death. I assigned those other conditions to contributory causes.

"Q. What do you mean when you state this man had heart failure?

"A. I mean that the heart was not exercising its proper function correctly in pumping the blood in the direction it should go, and the blood was becoming more or less stagnant in the chambers of the heart. The heart had enlarged in trying to overcome that stagnation and later dilated, and in dilating had caused back pressure into the liver. . . .

"Q. Doctor, assume that the man, whose organs you examined, had been subjected to an unusual strain, that he had been in an explosion where he was subjected to intense heat, heat of sufficient intensity to melt glass in the neighborhood in which he was at the time, and in order to escape from that heat he partially fell out of an opening, probably a window, across his middle body and eventually out of the window. Would such an experience be a causative factor in your opinion of producing the conditions which you found in the body of Mr. Mosedale?

"A. No sir., would not think that a factor.

"Q. Is it possible it might be a factor?

"A. Not in my opinion.

"Q. Could in no way at all?

"A. I see no association.

"Q. The fact that he might have bruised the middle part of his body would have no association with the cancerous condition?.

"A. No, not in my opinion. The primary carcinoma of the liver is usually the result of what is known as hardening of the liver.

"Q. And primary cancer of the liver usually originates with diseased condition of the gall bladder or duct?

"A. No. Usually originates in the liver itself due to the hardening process.

"Q. Would this experience I related to you tend to create the heart condition which you found?

"A. No, sir, I don't believe it caused the heart condition.

"Q. Would it have tended to create the lung condition you found?

"A. In my opinion it did not.

"Q. Would it have tended to create the kidney condition?

"A. You mean at the time or at the time of the autopsy?

"Q. At the time of the autopsy?

"A. No, I see no connection.

"Q. You see connection between such exposure and kidney condition?

"A. No, sir.

"Q. Then it is your opinion that the experience I have just related had no effect whatsoever on the man, or the organs you examined?

"A. In so far as cause of death, the cancer of the liver, no."

Dr. Rogers assisted in the autopsy and was of the opinion that the injuries sustained by the deceased at the gas plant had no connection with the cause of death. The witness in part stated:

"Q. You had an opportunity to examine the liver?

"A. Yes sir.

"Q. What did you find?

"A. There were multiple areas through the liver varying in size from two to ten cm., circumscribed round areas which had the gross appearance of an abscess. And the entire left lobe of the liver was completely involved with one of these large masses.

"Q. Did you arrive at any conclusion as to the cause of Mr. Mosedale's death?

"A. In my opinion the liver was the main factor.

"Q. And what was the condition of the liver?

"A. There was almost complete destruction of the left lobe of the liver, and the the smaller area in the right.

"Q. What in your opinion caused this condition?

"A. I don't believe at the time of autopsy it would be possible to determine the cause.

"Q. Is there a medical term for this condition of the liver you found?

"A. It had the gross appearance of multiple abscesses. The final diagnosis, of course, was microscopical."

Dr. Leland F. Carlton was of the opinion that the cause of Mosedale's death was carcinoma of the liver. He stated: "I have twice read the testimony in the case of William Mosedale, deceased, vs. The City of St. Petersburg, with special attention as to whether the carcinoma of liver found had any relation to the alleged injury.

"The symptoms of weakness with a slight improvement and exacerbation are characteristic of carcinoma of the liver. I know of no case on record in which carcinoma of the

liver has been definitely attributable to traumatism and it is my opinion that this is merely a coincidence and that the injury bears no relation to the carcinoma.

"I am of the opinion that his carcinoma would have developed had he never received an injury. It is possible that the heart condition in a man at his age could have been aggravated by the sudden shock, but this would be impossible to determine definitely.

"I think the cause of death was due to carcinoma of the liver."

The foregoing is a rough outline and brief synopsis of the testimony adduced by the respective parties. There is no dispute among counsel to the effect that Mosedale sustained injuries while in the employ of the City of St. Petersburg during an explosion at the gas plant on November 18, 1937, but the carrier strenuously contends that these injuries so sustained were *not* contributing factors in causing the death of the late Mr. Mosedale during the month of February, 1939. Counsel for appellants point to the testimony of Doctors Mills, Rogers and Carlton as sustaining their conclusion. We are frank in stating that the views and opinions of these physicians as to the cause of death of the late Mr. Mosedale was carcinoma or cancer and had no connection with the injuries sustained on November 18, 1937, clearly supports this view, but this testimony, with other testimony in the case, was before the entire membership of the Industrial Commission and was reviewed by the Honorable T. Frank Hobson.

The members of the Industrial Commission had a right in the exercise of its discretion when considering the testimony appearing in the record in the case at bar, to reach a conclusion and determine from the evidence the cause of death of the late Mr. Mosedale, and Chapter 17481, Acts of 1935, Laws of Florida, provides for a review thereof by

the circuit court. Section 26 of Chapter 17481, *supra,* provides that in *any* proceeding for the enforcement of a claim for compensation certain enumerated presumptions shall exist, in the absence of substantial testimony to the contrary, and they are, viz.:

"(a)   That the claim comes within the provisions of this Act.

"(b)   That sufficient notice of such claim has been given.

"(c)   That the injury was not occasioned primarily by the intoxication of the injured employee.

"(d)   That the injury was not occasioned by the wilful intention of the injured employee to injure or kill himself or another."

In the case of Firestone Auto Supply & Service Stores v. Bullard, 141 Fla. 282, 192 So. 865, this Court enunciated certain rules to be observed when considering cases similar to the case at bar, and said:

"Therefore, our construction is that the circuit court considers the case on record and enters such order as to the circuit court appears to be in accord with the law and the facts.   The circuit judge shall give to the findings of the Commission about the same weight and consideration which the chancellor should properly give to the findings of law and fact by a special master appointed by the court for that purpose.

"When, however, appeal is taken from the order of the circuit court to the Supreme Court, the Supreme Court shall give to the findings of fact by the circuit judge that degree of consideration, force and effect which the Supreme Court gives to the findings of a chancellor in an ordinary chancery suit, which means that if the circuit court has acted upon the record made before the Commission, great weight will be given findings of the circuit court.

"It follows that the burden in cases appealed to this Court is upon the appellant to show clearly that the circuit court has arrived at an erroneous or unwarranted conclusion."

In the application of the aforesaid rules, the burden was on the appellants to clearly establish error on the part of the lower court. We have thoroughly considered the entire record and conclude that the appellants have not met the burden as the law requires. The testimony as given by the learned physicians appearing as witnesses for the appellants was based on the history of the illness of the late Mr. Mosedale and the malignancy of the examined tissues taken from the liver of the deceased, and their conclusion was that death was due to cancer or carcinoma and this ailment was not, directly or indirectly, connected with the injuries sustained on November 18, 1937.

The testimony of the three physicians offered as witnesses for the claimant showed that Mr. Mosedale was in good health prior to receiving the injuries on November 18, 1937, but after sustaining these injuries he never regained his health. The testimony is supported by laymen seeing the deceased daily after the injury, as well as prior thereto, that he was a sick man after the injury. The circuit judge reviewed all the testimony and concluded that the injuries sustained were the cause of his death and there is an abundance of testimony, if not the weight of the testimony, to support this view, when the testimony is considered in its entirety.

We do not feel justified in disturbing the conclusions of the circuit judge and accordingly the order appealed from is hereby affirmed.

BROWN, C. J., TERRELL, CHAPMAN and THOMAS, J. J., concur.